## UNITED STATES v. GARBUTT et al.

Circuit Court of Appeals, Tenth Circuit.
October 18, 1929.

No. 69.

Ralph E. Smith, of Washington, D. C. (Albert D. Walton, U. S. Atty., of Cheyenne, Wyo., and C. M. Charest, of Washington, D. C., on the brief), for the United States.

H. Glenn Kinsley, of Sheridan, Wyo., for appellees.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

McDERMOTT, Circuit Judge. ▉ The appellees are stockholders of the Farnam Oil & Gas Company, a dissolved corporation, to whom were distributed its assets on dissolution. The government seeks to impress a trust upon such assets for the payment of corporate income taxes, claimed to be due for the year 1919. The right of the government to follow corporate assets into the hands of stockholders is not now open to dispute. Russell v. United States, 278 U. S. 181, 49 S. Ct. 121, 73 L. Ed. 255; United States v. Updike, 32 F.(2d) 1 (8 C. C. A.); United States v. Armstrong, 26 F.(2d) 227 (8 C. C. A.); United States v. Updike, 8 F. (2d) 913 (8 C. C. A.).

The controversy here is whether the corporation left any unpaid income tax, and, if so, how much; and that question, in turn, depends on the profit or loss realized on the sale of its properties. That the question presented is not easy of solution is demonstrated by the fact that the government itself has had many different ideas on the subject, although the evidentiary facts have been at all times disclosed. The corporation, in its 1919 return, claimed a loss of $7,502.20 on the sale. In 1921 the government computed a profit of $50,463.60 on the sale. In 1923 a government inspector reviewed the entire matter, and in a written report (a copy of which was sent the taxpayer) found that the sale resulted in a net loss of $13,761.65. Three years later this suit was brought, and the government then figured the profit from the sale to be more than $50,000. At the trial, in August, 1927, the government claimed that all its prior computations were entirely erroneous, and that it had now discovered the truth, and that in fact the profit from the sale was $31,198.13, no more and no less. When it is considered that the admitted sale price was only $62,497.80, the fact that the government's conclusions from the same facts varied from a profit of $50,463.60 to a loss of $13,761.65 (a spread of $64,225.25, $2,000 more than the gross sale price) gives some indication of the intricacy of the problem: The trial court, after a full hearing, found the sale resulted in a loss of $2,507.34, and the government appeals.

The evidentiary facts are not in dispute. In 1904 the corporation became the owner of two oil and gas leases in Oklahoma, one from Minnie Bell, a Cherokee Indian, covering 80 acres and expiring on October 3, 1919; the other from Lorena Bell, a minor Cherokee, covering 60 acres and expiring at the date of her majority, on October 12, 1917. Each lease contained a covenant to surrender at its expiration the leased premises and any buildings thereon, but reserving to the lessee the right to remove certain described equipment. The leases did not contain any provision extending them as long as oil or gas was found in paying quantities. By statute (32 Stat. 716, § 72) a Cherokee could only make a lease for a limited period and any agreement or lease of any kind or character violative of this section shall be absolutely void (section 72, Cherokee Treaty, Thomas' Ann. Acts of Congress, 5 Civ. Tribes and Osage Nation, p. 217), and it has been held that any agreement to extend beyond such limited period is void. United States v. Noble, 237 U. S. 74, 35 S. Ct. 532, 59 L. Ed. 844.

The corporation proceeded to develop these leases, drilling wells from time to time, and in 1917 there were 14 wells on the 80 acres and 9 wells on the 60. When the Lorena Bell lease expired in October, 1917, the corporation took new leases from both the lessors, surrendering the unexpired term of the Minnie Bell lease, the new leases running as long as oil or gas should be produced, and carrying a 25 per cent. royalty instead of the former figure of 15 per cent. The lessors were paid $15,000 in cash for the new leases. At about the same time the corporation purchased certain other lease rights at a cost of $5,000, and made certain improvements thereon at a cost of about $500. In 1919, the corporation sold all of its properties for $62,497.80. The original cost of the leases in 1904, and development cost thereon prior to January 1, 1917, as shown by the January 1, 1917, balance sheet of the company, was $60,237.50. The government vouches for the accuracy of this figure by requesting that the trial court so find. The expenditure of $20,537.07 thereafter is not questioned.

■ The sole question being what profit, if any, was realized from the 1919 sale, the inquiry at the threshold would appear to be: What property was sold in 1919? From an examination of the record, it would appear that the sale might have been treated as one of leases acquired in 1917, the earlier ones having either expired or been surrendered. Such a treatment of the sale would have required proof as to the value in 1917 of the unexpired term of the Minnie Bell lease (a part of the consideration of the new leases), the value of the removable equipment on that date, and many other facts not in the record. It would have made immaterial any question of 1913 value of the leases, or of depletion between 1913 and 1917. But the government, in the court below and here, treats the property sold in 1919 as a single property acquired in 1904 and continuously owned and operated by the taxpayer from 1904 to the date of the sale. At the trial, the government's chief witness stated at the outset that "I made an appraisal of the March 1st, 1913 value." All his computations are predicated upon that figure, and depletion and depreciation in the succeeding years. The trial court was requested to find the March 1, 1913, value. Error is assigned because of the alleged holding of the trial court "that the March 1, 1913, value of the leases * * * was immaterial." In the brief in this court, counsel say: "As these assets were acquired prior to March 1, 1913, the computation is dependent upon the determination of (a) the cost and (2) the March 1, 1913, value."

We review the case tried, and not some other case that might or might not have been brought. Nor will it do to say that the government set up a March 1, 1913, value, and then obliterated it by depletion, and thus wiped out the past. The fact remains that the government presented evidence of March 1, 1913, value, and asked the trial court, from all the evidence, to find that value; asked the trial court to find the facts as to depletion and depreciation between then and 1917; and renews that request here. That, then, must be the case for our consideration.

Counsel for the government fairly and accurately state the law governing the transaction, which in fact cannot be seriously in dispute. The March 1, 1913, value must first be ascertained from the evidence. To that is added sums spent in "subsequent allowable capital additions." From such sum is deducted allowable depreciation and depletion, whether in fact taken or not. United States v. Ludey, 274 U. S. 295, 47 S. Ct. 608, 71 L. Ed. 1054. The resulting figure gives the value of the thing sold. Given, then, the sale price, the profit or loss from the transaction is a mere matter of subtraction.

Counsel assert that the trial court did not in fact do this; they undertake to impeach his decree by certain statements in a memorandum opinion filed, and ask us to explore the mental processes of the trial court by an elaborate comparison of figures in various exhibits. This we decline to do.

■ First, then, as to the 1913 value: The decree makes no specific finding as to this value, but from the admitted sale price, the admitted expenditure of $20,000 in 1917, and the depletion allowance, it is apparent that he arrived at a March 1, 1913, value of about $56,000. What was the evidence on the point?

The government's witness testified as to this value from an analytic appraisal. He used a formula involving the amount of oil later recovered, its net value, the present value as of March 1, 1913, of the deferred expected receipts, in accordance with the Hoskold Present Value and Interest Tables. For the value of the equipment on the property he took the 1917 book cost, assumed without any basis in fact that it had been acquired prior to the year 1909, and depreciated it 10 per cent. a year for the years 1909, 1910, 1911, and 1912, a total of 40 per cent. Against this purely theoretical valuation, the trial court had evidence of actual sales of similar property, at a per barrel price that would show an actual value in excess of the amount found, sales of stock in the corporation itself, actual cost, and other evidence bearing directly on value, tending to prove a value in excess of that found. Confronted with one witness who figured value from a book of formulæ, and others who testified as to what it was worth in dollars and cents on the market, the trial court followed the direction of the Treasury Department, being article 207 of Regulation 69, which is: "Where the fair market value of the property at a specified date is the basis for depletion and depreciation deductions, such value must be determined, subject to approval or revision by the Commissioner, by the owner of property in the light of the conditions and circumstances known at that date, regardless of later discoveries or developments in the property or subsequent improvements in methods of extraction and treatment of the oil and gas product. The value sought should be that established assuming a transfer between a willing seller and a willing buyer as of that particular date. The Commissioner will give due weight and consideration to any and all factors and evidence hav-

ing a bearing on the market value, such as cost, actual sales and transfers of similar properties, market value of stock or shares, royalties and rentals, value fixed by the owner for purpose of the capital stock tax, valuation for local or State taxation, partnership accountings, records of litigation in which the value of the property was in question, the amount at which the property may have been inventoried in probate court, and, in the absence of better evidence, disinterested appraisals by approved methods. Where the fair market value must be ascertained as of a certain date, analytic appraisal methods, such as the present value method, will not be used if the fair market value can reasonably be determined by any other method."

As to the physical equipment, there was direct evidence that much of it was purchased long after 1909; that much of it was in use after twenty years; in the face of that evidence, a value predicated upon a 40 per cent. depreciation because it was all erroneously assumed to be four years old, must be disregarded. We conclude that the record supports a March 1, 1913, valuation of this property as found.

Depletion and depreciation, like value, are troublesome questions of fact. As the Supreme Court said in the Ludey Case: "The fact that the reserve is hidden from sight presents difficulties in making an estimate of the amount of the deposits. The actual quantity can rarely be measured. It must be approximated. And because the quantity originally in the reserve is not actually known the percentage of the whole withdrawn in any year, and hence the appropriate depletion charge, is necessarily a rough estimate. But Congress concluded, in the light of experience, that it was better to act upon a rough estimate than to ignore the fact of depletion." Page 302 of 274 U. S., 47 S. Ct. 610, 71 L. Ed. 1054.

And government counsel, in their brief, say: "The March 1, 1913, value must be determined from all the facts in the case. The fair market value as of March 1, 1913, cannot be determined with exactness any more than depletion and depreciation may be determined with exactness. They must be determined as nearly as may be from all the ascertainable facts."

Between 1913 and 1916 Congress had fixed in the case of mines a maximum allowance, for the exhaustion, wear, and tear of property, of 5 per cent. of the gross value of the output. Act Oct. 3, 1913, 38 Stat. 114, § 2 (B), par. 2(6). The 1916 law provided for a "reasonable allowance * * * to be as-

certained * * * by the settled production." Act Sept. 8, 1916, 39 Stat. 756, 767, § 12(a). The 1918 law provided for a reasonable allowance based on the March 1, 1913, value, as to properties theretofore acquired. Act Feb. 24, 1919, § 234(a)(9), 40 Stat. 1078. The trial court allowed $11,775.38 for such depletion and depreciation. This allowance is complained of. The record discloses that some of these 1905 wells were still producing in 1927, and much of the equipment was still in use, and that the equipment was of the very best. For the years 1913, 1914, and 1915, depletion must be calculated on gross output; it may not exceed 5 per cent., and in a long-lifed field such as this, should be less than that. During 1916 and 1917, depletion is calculated on "the settled production" of the lease. For 1918 and part of 1919, it is calculated on March 1, 1913, value. We have gone over the evidence involved in a proper depletion charge, using the same allocation between equipment cost and development cost as testified to by the government's expert. We have considered the gross output for the first three years in the light of the 5 per cent. maximum; considered the settled production for the next two years, and the 1913 value for the balance of the period. We have considered depreciation of the equipment in light of its character and its history, and while the result is necessarily a rough estimate, we conclude that there is support in the record for the trial court's findings in respect thereto.

■ Complaint is made that the trial court admitted evidence as to an oral agreement to extend the leases. In any action on the leases, or an agreement to extend, this evidence would be incompetent, as in violation of the parol evidence rule, and of the cited statute forbidding Indians to circumvent their restrictions. It is very doubtful if it has any evidentiary bearing on the value of the property; however, there is no indication that the trial court considered the evidence at all; on the contrary, his memorandum opinion indicates that he arrived at his conclusions without reference thereto. In our review of the record, this evidence has been ignored; and the error, if any, in its admission is not ground for reversal.

■ A complaint is made as to interest. The trial court found that the corporation owed $344.30 of income taxes for the year 1919, which was payable in quarterly installments beginning March 1, 1920. The trial court allowed interest in the sum of $60.92. We think interest at 1 per cent. a month should

have been computed from the due dates in 1920.

The decree is modified as to the interest; otherwise affirmed.