**UNITED STATES v. STAR CONST. CO.,**
Inc., et al.

Civil Action No. 3254.

District Court, W. D. Oklahoma.

May 20, 1948.

As Modified June 1 and 10, 1948.

759

VAUGHT, District Judge.

This is an action by the United States of America against the defendants to recover the sum of $110,000 excessive profits upon four contracts renegotiated under section 403, 6th Supplemental National Defense Appropriation Act of April 28, 1942, Title 50, U.S.C.A.Appendix, § 1191.

A brief resume of the facts, as admitted or undisputed, is necessary to a proper consideration of this case.

On May 20, 1942, D. H. Rowland organized the Star Construction Company, Inc., an Oklahoma corporation. He associated with him in this corporation the defendants H. C. Adams and B. L. Miracle. The capital stock of the corporation consisted of 100 shares of the par value of $500 per share. One share was issued each to Adams and Miracle and the other 98 shares were issued to Rowland. Rowland paid into the corporation $1500 in cash and gave his note to the corporation for $48,500. This corporation secured four government contracts: Two dated June 7, 1942, one dated June 21, 1942, and one dated August 14, 1942. The note of Rowland was used by the corporation in securing and establishing credit. Rowland also furnished to the corporation certain trucks and equipment. The corporation required in excess of $200,000 as working capital and this was secured through the personal credit of Rowland. The four contracts were secured by surety bonds. Rowland provided those bonds and indemnified the surety by his personal credit.

The four contracts were let upon competitive bids and involved a total consideration of $895,216.70. In securing the services of Adams, Rowland employed him through the corporation at a stipulated salary with the additional understanding that upon the completion of the contracts, Adams was to participate in some undetermined way in the profits. In the Fall of 1942, after the first contract was completed and at a time when the remaining three contracts were approximately eighty per cent completed, the question as to the amount of profits which Adams was to receive, required consideration. This resulted in an agreement between Rowland and Adams by the terms of which Rowland

Robert E. Shelton, U. S. Atty., of Oklahoma City, Okl., for plaintiff.

Roy C. Lytle, of Keaton, Wells, Johnston & Lytle, and Charles E. France, of France, Johnson, Gordon & Cook, all of Oklahoma City, Okl., for defendants.

disposed of his interest in the corporation to Adams, Rowland selling and transferring by a bill of sale all of the stock of the corporation to Adams for the sum of $178,500, taking in payment therefor Adams' note for the amount without any security, due ninety days after date, with interest at the rate of four per cent. At that time Adams was a man of small means, being worth approximately $10,000 to $15,000. It appears that thereafter Rowland had no further connection with the corporation or completion of the contracts. The bill of sale of November 28, 1942, contained the following:

"That D. H. Rowland of Dallas, Texas, has on this 28th day of November, 1942, bargained, sold, *conveyed, transferred* and by these presents does bargain, sell, *convey, transfer* and *deliver* unto H. C. Adams, *One Hundred* (100) *shares* of the *capital stock* of the Star Construction Co., Inc., an Oklahoma corporation, of a par value of Fifty Thousand Dollars ($50,000.00), together with *all* and *every right* which *now exists* or which *may have* at any time heretofore existed in favor of the said D. H. Rowland, as *owner* of such shares of stock, for and in consideration of the sum of One Hundred Seventy-eight Thousand, Five Hundred Dollars ($178,500.00), * * *." (Emphasis supplied.)

On November 30, 1942, H. C. Adams, as the owner of all the capital stock of the Oklahoma corporation, transferred all of said stock to the corporation in exchange for all of its assets, including the then uncompleted contracts, taking formal assignments of the contracts and assuming all the liabilities of such corporation. This transaction had the effect of liquidating the Oklahoma corporation. No notice of this transaction was given to the proper officers of the government. Following the acquisition of all the assets of the Oklahoma corporation, H. C. Adams organized a Delaware corporation, using the name Star Construction Company, on December 1, 1942. Adams then sold all of the assets he had acquired from the Oklahoma corporation to the Delaware corporation, including the three uncompleted contracts, the Delaware corporation taking formal as-

signments of the contracts from Adams. The consideration in this transaction was $178,500, represented by an unsecured note of the Delaware corporation to H. C. Adams, dated December 1, 1942, for $178,500, due seventy five days from date with interest at four per cent per annum. No notice of this transaction was given to the proper officers of the government. The Delaware corporation continued to use the office and place of business occupied by the Oklahoma corporation.

The Delaware corporation had an authorized capital stock of $100,000, divided into 1000 shares of the par value of $100 per share. The outstanding issued stock of the corporation had a stated value of $1500 and was issued to and owned by H. C. Adams although two qualifying shares were issued to other parties.

The Delaware corporation completed the three unfinished contracts on or about April 1, 1943. There was no default in any of the contracts. All bills were paid. From money received from the government on the contracts by the Delaware corporation, the note to Adams was paid by the checks of the Delaware corporation as follows: February 10, 1943, $123,500; March 13, 1943, $15,000; March 13, 1943, $40,000; and April 26, 1943, $1595.29, interest. The Adams note to Rowland for $178,500 was paid to Rowland by checks drawn by Adams as follows: February 10, 1943, $123,500; March 13, 1943, $55,000; and April 26, 1943, $1595, interest. At this time there were no unpaid creditors of either corporation, nor was there any actual notice or intimation that the government had any claim, or would seek to renegotiate the contracts.

It is admitted that the only assets which the Oklahoma corporation had at the time it entered into these contracts were the $1500 which had been paid it by Rowland and Rowland's note to it for $48,500. At the time of the sale by Rowland of his stock in the corporation to Adams, the other assets of the corporation consisted principally of the proceeds which would be received from the government upon the completion of the contracts. In determining the value of the stock sold by Rowland

to Adams the following financial statement was used by the parties:

Properties:

| | | |
|---|---|---|
| Cash in Banks | | $ 96,227.77 |
| Accounts Receivable and Advances | | 4,636.68 |
| Notes Receivable | | 48,500.00 |
| Inventory: | | |
| Works in Progress | $239,537.57 | |
| | 181,588.94 | |
| | 183,812.73 | 604,939.24 |
| Bonds and Stamps | | 81.00 |
| Deposits | | 163.00 |
| Prepaid Insurance | | 1,114.86 |
| Machinery and Equipment | $5,148.82 | |
| Less Depreciation | 347.31 | 4,801.51 |
| Furniture and Fixtures | $ 725.50 | |
| Less Depreciation | 15.98 | 709.52 |
| Autos and Trucks | $3,965.80 | |
| Less Depreciation | 1,638.42 | 2,327.38 |
| Total | | $763,500.96 |

Liabilities, Claims, et cetera:

| | |
|---|---|
| Accounts Payable (Trade, etc.) | $ 89,259.06 |
| Accounts Payable (on contracts) | 117,238.66 |
| Accrued Wages | 4,973.47 |
| Accrued Taxes | 5,091.90 |
| Badge Deposits | 27.00 |
| Deposits on Incomplete Contracts | 325,573.89 |
| Accrued Federal Income Tax | 17,836.98 |
| Reserve for Contingencies | 25,000.00 |
| Total | $585,000.96 |

After completion of the contracts and after the payments had been made by the government, as hereinbefore stated, the Delaware corporation paid its note to Adams, Adams paid his note to Rowland, and Rowland paid his note of $48,500 to the Star Construction Company.

On November 8, 1944, the Price Adjustment Board addressed a letter to the Star Construction Company, Inc., an Oklahoma corporation, the Star Construction Company, a Delaware corporation, and H. C. Adams, c/o Star Construction Company, relative to the renegotiation of the four contracts and advised the said corporations and Adams that after reviewing the contracts, it was determined that there were excessive profits in the four contracts of $110,000, representing $20,000 on the first completed contract, and $90,000 on the last three completed contracts. In other words, the actual profits on the four contracts amounted to $191,752, from which the government should deduct $110,000 as excessive profits. Following this letter and a hearing, the Price Adjustment Board entered an order fixing the excessive profits at $110,000 on the four contracts. It is not for this court to say whether or not the $110,000 was a fair deduction for excessive profits. Upon the face of the order it is apparently an arbitrary order, but it is beyond the jurisdiction of this court to question, review or modify said order.

In the present action the government sues the above-named defendants, including D. H. Rowland, H. C. Adams and B. L. Miracle, for the recovery of said sum of $110,000, as excessive profits. The cause has been dismissed by the plaintiff as to defendant Miracle.

There are certain outstanding facts connected with this entire situation that challenge the consideration of the court, as follows:

1. The sale of the capital stock in the Oklahoma corporation by Rowland to Adams for the sum of $178,500, Rowland taking Adams' unsecured note for said amount.

2. The surrender of all the capital stock of the Oklahoma corporation by Adams in consideration for all the assets of the Oklahoma corporation.

3. The organization of the Delaware corporation by Adams under the name of the Star Construction Company.

4. The sale of all the assets of the Oklahoma corporation, thus acquired by Adams, to the Delaware corporation for $178,500, Adams receiving its unsecured note for said amount in payment therefor.

5. The completion of the contracts by the Delaware corporation and the collection by the Delaware corporation of the sums due from the government under the contracts.

6. The payment of the note of $178,500 to Adams · by the Delaware corporation from the proceeds of the contracts.

7. The immediate payment, therefore, by Adams of his note for $178,500 to Rowland.

8. And finally, the payment by Rowland of his note for $48,500 made to the Oklahoma corporation and now held by the Delaware corporation.

The government contends that these various acts were made with the design to deceive and mislead the government as to the actual contractor which completed these contracts and to avoid the payment of any excessive profits determined after a renegotiation hearing on said contracts.

The Oklahoma corporation was the Star Construction Company, Inc. The Delaware corporation was the Star Construction Company. The same office was used by both corporations and the construction work by both corporations was actively conducted by Adams, and those under him, without any indication to the government that there had been any change in the corporate structures.

Rowland, on an original investment of $1500 and the payment of his note of $48,500, after he had been paid $178,500 by Adams, received in fact practically every dollar of profits made on the four contracts.

It is contended by the government that this entire plan was Rowland's and that Adams, willingly or unwillingly, was the mere agent of Rowland; that Rowland planned the entire scheme so that he would receive the profits, free of any renegotiation action.

■ Excessive profits as determined by renegotiation must be recovered from the profits, and from the one who received the profits.

In the consideration and analysis of the entire situation, as it is unfolded by the evidence, many facts must be taken into account. In the organization and conduct of such a business enterprise, by men of acumen and experience, every activity of the parties engaged in the enterprise must have had some motive. In determining what motives inspired or brought about certain actions of the parties, the fundamentals involved must be considered. What was the ultimate purpose of the actors, when the action was taken, and why was it taken?

D. H. Rowland organized the Oklahoma corporation, the Star Construction Company, Inc., owning all of its capital stock. Its major activities were to procure and perform contracts with the government during the war. Four contracts were entered into by the Oklahoma corporation: two under date of June 7, 1942; one, June 21, 1942; and one, August 14, 1942. With the exception of contract No. 257—1374, the first one completed, each of these contracts contained clauses in regard to renegotiation. Contracts No. 257—1665 and No. 257—1740 contained the following:

"(a) Upon the written demand of the Secretary, at such period or periods when, in the judgment of the Secretary, the profits accruing to the Contractor under this contract can be determined with reasonable certainty, the contract price will be renegotiated to eliminate therefrom any amount found as a result of such renegotiation to represent excessive profits. The demand of the Secretary shall fix a place for renegotiation and a time for commencement thereof not later than one year after the date of completion or termination of the contract as found by the Secretary.

"(b) The Contractor will furnish to the Secretary such statements of actual costs of production and such other financial statements, at such times and in such form and detail, as the Secretary may prescribe, and will permit such audits and inspections of its books and records as the Secretary may request.

"(c) The Government *shall retain* or the *Contractor shall repay* to the Government,

as the Secretary may direct, *any amount* of the *contract price* found as a result of such renegotiation to represent excessive profits." (Emphasis supplied.)

Contract No. 957—1169 contained the following clauses:

"(a) At such period or periods when, in the judgment of the Secretary of War, the profits accruing to the contractor under this contract can be determined with reasonable certainty, the Secretary of War and the contractor, upon the written demand of the Secretary of War, will renegotiate the contract price with a view to eliminating such profits as are found as a result of such renegotiation to be excessive.

"(b) In the event that such renegotiation results in a reduction of the contract price, the amount of such reduction shall be retained by the Government or repaid to the Government by the contractor, as directed by the Secretary of War."

These contracts were not transferable without the consent of the government, under Title 41 U.S.C.A. § 15, which provides in part as follows:

"No contract or order, or any interest therein shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. * * *"

 These are four simple contracts. The Oklahoma corporation agreed to furnish certain materials and perform certain services. The government agreed, for such materials furnished and services rendered, to pay certain amounts of money which included profits on the transactions. The corporation agreed that the profits on the contracts would be subject to renegotiation when the contracts were completed and that the government could *withhold* what it determined to be excessive profits, or in the event such excessive profits had been collected by the corporation, it would *repay* the same to the government. The government had and maintained a definite interest in the excessive profits until a full and complete settlement had been effected between the parties either by renegotiation or operation of law. Anything that the defendant Rowland, who owned the entire capital stock of the Oklahoma corporation, or that the corporation itself might have done, could not divest the government of that interest without its consent. The government could pursue that interest wherever it might be found. Regardless of the form of the activities employed by the defendants, the excessive profits came to rest in the hands of Rowland. Thus, for the reasons hereinafter set forth, the court is justified in disregarding the form employed by the parties and in looking only to the Oklahoma corporation and the defendants Rowland and Adams, as the principal actors, and the Delaware corporation, as a successor with full knowledge of all the facts, in the solution of the problem. That the Oklahoma corporation, as the original contractor, and the Delaware corporation, as successor, are liable for the excessive profits there is no doubt. As to Adams and Rowland, what were their motives in these various activities, which by a rather complicated and circuitous route resulted in depleting the assets of the Oklahoma corporation and caused the profits from the contracts to come to rest in the hands of Rowland? It is apparent that Rowland had in mind that the Adams note to him was to be paid out of the profits on the contracts when completed. In view of what so swiftly followed, it is evident that Adams had in mind, and depended upon, the profits on the contracts for the funds to pay his note to Rowland. Considering the dates of payment, the funds out of which both the note of Adams to Rowland and the note of the Delaware corporation to Adams were paid, the motives of the parties become quite clear. The motives that actuated the parties must have been to accomplish the results they accomplished. And what were those results? They rendered the Oklahoma corporation, the contractor, an organization in name only with no assets, and the Delaware corporation incapable of meeting their obligations under the provisions of the contracts. From the beginning the government dealt with the Star Construction Company, Inc., as it existed when the contracts were en-

tered into, and nothing ever came to its attention that would cause any inquiry that at the completion of the contracts and the payment thereunder, it was dealing with a different organization. The facts, whether designed or otherwise, cannot lead to any other reasonable conclusion than that the conduct of Rowland and Adams was calculated to conceal and deceive and to gain possession of the excessive profits and place them, if possible, beyond the reach of the government. Notwithstanding the contention of Rowland and Adams that their conduct was from pure motives and in the utmost good faith, their actions show a calculated and concerted course of conduct to accomplish the exact result they did accomplish. We are therefore justified in "looking through forms to the substance of things" in this situation.

The principle of law that governs such situations is discussed in Linn & Lane Timber Company et al. v. United States, 9 Cir., 196 F. 593, 598, wherein the court quoted from numerous cases as follows:

"In McCaskill Co. v. United States, 216 U.S. 504, 30 S.Ct. 386, 54 L.Ed. 590, the court said: 'A growing tendency is therefore exhibited in the courts to look beyond the corporate form to the purpose of it, and to the officers who are identified with that purpose'—citing Cook on Corporations, §§ 663, 664, in which it is said: 'The disabilities of the corporation are not disabilities of the stockholders, nor are the disabilities of the stockholders the disabilities of the corporation. Hence it is that a corporaton is often organized to act as a cloak for fraud. Such cases as these are becoming common, and the courts are becoming more and more inclined to ignore the corporate existence when necessary in order to circumvent fraud.'

"In re Rieger, Kapner & Altmark, D.C., 157 F. 609, the court said: 'The doctrine of corporate entity is not so sacred that a court of equity, looking through forms to the substance of things, may not in a proper case ignore it to preserve the rights of innocent parties or to circumvent fraud.'

"In United States v. Milwaukee Refrigerator Transit Co., C.C., 142 F. 247, in which it was alleged that the corporation defendant was a dummy organized, owned, and operated by the stockholders of a brewing company as a device to cover the receipt of rebates on interstate shipments of beer, the court said: 'If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.'

"In First National Bank of Chicago v. F. C. Trebein Co., 59 Ohio St. 316, 52 N.E. 834, the court said: 'The fiction by which an ideal legal entity is attributed to a duly-formed incorporated company, existing separate and apart from the individuals composing it, is of such general utility and application as frequently to induce the belief that it must be universal, and be in all cases adhered to, although the greatest frauds may thereby be perpetrated under the fiction as a shield. But modern cases, sustained by the best text-writers, confine the fiction to the purposes for which it was adopted—convenience in the transaction of business and in suing and being sued in its corporate name, and the continuance of its rights and liabilities, unaffected by changes in its corporate members—and have repudiated it in all cases where it has been insisted on as a protection to fraud or any other illegal transaction.'

"And in State v. Standard Oil Co., 49 Ohio St. 137, 30 N.E. 279, 15 L.R.A. 145, 34 Am.St.Rep. 541, the same court said: 'On a question of this kind, the fact must constantly be kept in view that the metaphysical entity has no thought or will of its own; that every act ascribed to it emanates from and is the act of the individuals personated by it; and that it can no more do or act, or refrain from doing it, contrary to the will of these natural persons than a house can be said to act independently of the will of its owner; and, where an act is ascribed to it, it must be understood to be the act of the persons associated as a corporation, and whether done in their capacity as corpor-

ators or as individuals must be determined by the nature and tendency of the acts.'

"If in any conceivable case a court of equity should look through the form to the substance, it should do so in a case like this. The corporation is Smith. It is Smith seeking shelter behind articles of incorporation and invoking the legal fiction of a corporate entity for his protection in the perpetration of a fraud. Said Lord Mansfield in Johnson v. Smith, 2 Burr. 962: 'The court would not endure that a mere form or fiction of law, introduced for the sake of justice, should work a wrong contrary to the real truth and substance of the thing.'

"Says Morawetz, in his work on Corporations (section 227): 'The statement that a corporation is an artificial person or entity, apart from its members, is merely a description, in figurative language, of a corporation viewed as a collective body. A corporation is really an association of persons, and no judicial dictum or legislative enactment can alter this fact.' "

So in the case at bar, while Rowland owned the stock, Rowland was the corporation and the corporation was Rowland. When Adams acquired the stock, Adams was the corporation and the corporation was Adams. In the Delaware corporation, Adams was the corporation and the corporation was Adams.

While the bill of sale from Rowland to Adams, in the transfer of the capital stock of the Oklahoma corporation, did not formally assign the contracts with the government to Adams, it was the first step in the procedure employed by the parties by which the assignment of the contracts to Adams was accomplished and, "looking through forms to the substance of things," it did result in that type of transfer. So far as the government was concerned, the transfer was a nullity under the statute, 41 U.S.C.A. § 15, supra.

In the case of Rucks-Brandt Construction Corporation et al. v. Silver, 194 Okl. 324, 151 P.2d 399, the situation is similar in principle to the instant case. On December 30, 1931, the State Industrial Commission entered an award against the Rucks-Brandt Construction Company (hereinafter referred to as "Construction Company") and its insurance carrier for $9000. On May 2, 1932, the secretary of the Commission advised the Construction Company that it would be necessary for it to make payment of the award, or have the award filed in the court clerk's office and have execution issued thereon. On May 10, 1932, the Construction Company executed a chattel mortgage for $10,000 to the First National Bank & Trust Company of Tulsa, Oklahoma. On May 17, 1932, the award was certified to the District Court of Tulsa County. On the same day an affidavit of garnishment was filed by the plaintiff, Silver, and an order in garnishment was issued to the City of Tulsa to reach certain funds owed by the City to the Construction Company. The order was not served on the City. On the same day the Construction Company obtained a district court order enjoining the sheriff from levying execution on the award. On May 18 the Construction Company received a warrant in the sum of $7904.30 from the City as payment on a contract for the construction of a bridge. On the same day this warrant was deposited in a bank in Tulsa in the name of "R. B. Company." Thereafter the Rucks-Brandt Construction Corporation (hereinafter referred to as "Construction Corporation") was perfected and on May 25, 1932, authorized to do business in Oklahoma. The officers of the new corporation were William M. Thompson, R. Brandt and B. F. Rucks. These men were the same officers and directors of the Construction Company. On the same day the Construction Company assigned its contract with the City to the new corporation, the Rucks-Brandt Construction Corporation, and it is apparent that all of the property of the Construction Company was also assigned to the new corporation. Between June 8 and October 6, 1932, the City paid $68,870.16 to the Construction Corporation on the contract made by it with the Construction Company for the construction of the bridge. On June 7, 1932, the injunction obtained by the Construction Company was dissolved. On June 15 the Construction Company filed a second injunction suit against Silver and the sheriff of Tulsa County. On Septem-

ber 23 the Construction Company filed its appeal in the Supreme Court of Oklahoma from the order and judgment of the District Court dissolving the injunction issued June 15. On July 18, 1933, the Supreme Court affirmed the judgment and entered judgment for Silver. On May 5, 1934, the United States Supreme Court denied certiorari in that case. 291 U.S. 679, 54 S.Ct. 526, 78 L. Ed. 1067. The record disclosed that out of the funds received from all the transactions above set forth, the defendants Brandt and Rucks received together the sum of $10,428.56. The plaintiff contended that the transfer of the funds and property to the Construction Corporation by the Construction Company left it wholly without funds and property with which to pay the plaintiff (Silver) and that the various transactions, suits, et cetera, were all done in furtherance of a fraudulent design and scheme to defeat the payment of the award, and that he was entitled to a judgment against the Construction Corporation, Rucks and Brandt. In passing upon the principle of law involved, the court said [194 Okl. 324, 151 P.2d 401]:

"In reality this is an action to have the Rucks-Brandt Construction Corporation adjudged to be the same entity as its predecessor and assignor, Rucks-Brandt Construction Company, and to trace and apply upon plaintiff's award funds and property which were assigned and transferred to the other defendants, Rucks and Brandt, by the defendant debtor company. It is apparent from the record that all the funds and property belonging to the debtor company were transferred to the successor corporation upon its creation with the intent to defraud, delay and defeat the plaintiff though there might have been other incidental reasons for the creation of the corporation. Such transfers were void and the individual defendants had full knowledge of the purposes for which such transfers were made and are, under all the circumstances maintaining liable to this plaintiff to the extent of the funds and property received by them from the corporation. 24 O.S.1941 §§ 5, 6, 7, 8."

This case is squarely in point. While it is true, at the time of the transactions involved, the Silver award had been determined, that does not change the rule.

In Armour & Co., of Delaware v. B. F. Bailey, Inc., 5 Cir., 132 F.2d 386, it was held:

"The rule that a creditor cannot maintain an action to set aside a fraudulent conveyance in federal court until he has reduced his claim to judgment has been abrogated by the adoption of the federal rules. Federal Rules of Civil Procedure, rule 18 (b), 28 U.S.C.A. following section 723c."

In the case at bar the government, by the plain provisions of its contracts with the Oklahoma corporation had a valid claim for any excessive profits paid under the contracts as renegotiated. The fact that that amount had not been determined at the time of the various activities and manipulations disclosed by the evidence could not affect that claim. But Rowland contends that he was not formally notified of the time and place of the renegotiation proceedings and that by reason thereof, the agency that renegotiated the contracts had no jurisdiction to include him in the order. This action is a suit upon the renegotiation order and Rowland is made a party defendant here, and the court has a jurisdiction of both the parties and the subject-matter. However, the record does disclose, and there is no contention otherwise, that the Oklahoma corporation was properly before the renegotiation agency. That corporation was the original contractor and Rowland, at the time the contracts were made, owned all of the capital stock. He was in fact the corporation. Aside from all of that, the record further discloses that Rowland not only knew that the renegotiation proceedings were in progress, but was actually physically present, at least part of the time, while those proceedings were in progress.

The question naturally arises, how far can these assets be traced and subjected to valid claims? In income tax cases the matter has been taken care of by statute. See Hunn et al. v. United States, 8 Cir., 60 F.2d 430; Hatch v. Morosco Holding. Co., Inc., et al., 2 Cir., 50 F.2d 138; United States v. Garbutt et al.,

10 Cir., 35 F.2d 924; United States v. Armstrong et al., 8 Cir., 26 F.2d 277. However, there is very little, if any, distinction in those cases and the instant case in principle. In the case at bar both by statute and the provisions of the contracts, the excessive profits were a valid interest that could be followed into the hands of anyone who participated in the fraud.

In Jahn v. Champagne Lumber Company et al., 7 Cir., 157 F. 407, it was held (headnote 2):

"Where all the property of a corporation has been sold and the proceeds distributed to stockholders, such proceeds constitute in their hands a trust fund for the payment of the debts of the corporation which may be reached by a creditors' bill, whether the distribution was actually fraudulent or not."

And in the body of the opinion, 157 F. at page 413:

"* * * The defendants allege that the corporation died from natural causes, while the complainant contends that it was a case of corporate suicide to escape the sanctions of the law. For the purposes of this proceeding, the court is bound to accept the version of the defendant that no actual fraud was intended. The fact that the corporation is civilly dead is sufficient ground for invoking the trust-fund theory, whether the manipulation of the corporate assets involved actual fraud or not. The machinery of the law not being adequate to enforce the judgment, the aid of this court may be sought to enforce an equitable levy. * * *."

In Pierce et al. v. United States, 255 U. S. 398, 41 S.Ct. 365, 65 L.Ed. 697, the principle of law was before the court. The Waters Pierce Oil Company, a Missouri corporation, was indicted in 1907 for receiving rebates. In 1913 the corporation sold and transferred all its property to the Pierce Oil Corporation; all the proceeds were paid to Henry S. Priest and Clay Arthur Pierce as trustees; and they distributed the same among the stockholders. In 1914 the case was tried under the indictment. The Waters Pierce Oil Company was convicted and fined $14,000. The judgment was later affirmed by the Circuit

Court of Appeals. Waters-Pierce Oil Co. v. United States, 5 Cir., 222 F. 69. An execution issued and was returned nulla bona. A bill in equity was then filed against the Waters Pierce Oil Company, the trustees, and three stockholders to obtain satisfaction of the judgment out of money remaining in the hands of the trustees and that received by the stockholders. The District Court entered a decree dismissing the bill as against the Waters Pierce Oil Company and the trustees, but granted, as against the stockholders named, the relief prayed for by the government. The decree was affirmed by the Circuit Court of Appeals and appealed to the Supreme Court. Mr. Justice Brandeis delivered the opinion of the court, which held [255 U.S. 398, 41 S.Ct. 366]:

"* * * The law which sends a corporation into the world with the capacity to act imposes upon its assets liability for its acts. The corporation cannot disable itself from responding by distributing its property among its stockholders and leaving remediless those having valid claims. In such a case the claims after being reduced to judgments may be satisfied out of the assets in the hands of the stockholders. * * *

"A corporation cannot by divesting itself of all property leave remediless the *holder of a contingent claim,* or the *obligee of an executory contract,* (citing authorities); and there is no good reason why the United States with a claim for penalties should be in a worse plight. Here the stockholders receiving the assets are in the position of volunteers; and there is not even the excuse that they were ignorant of the Government's claim. They were officers of the corporation, and the indictment was pending when the transfer of the assets was made. * * *" (Emphasis supplied.)

It is the opinion of this court that the plaintiff is entitled to recover from the defendant the sum of $110,000, less the amount of taxes paid to the government on the profits reported, which the defendants are entitled to have deducted.

Findings of fact, conclusions of law and form of judgment, consistent with this opinion, may be submitted within fifteen days from this date.